UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEIGH ANN JACKSON, | CASE NO. LA CV 19-10450-DOC (Ex) |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| EILEEN A. GASPAR, PROFESSIONAL PLAN ADMINISTRATORS, INC., and PROFESSIONAL PENSION ADMINISTRATORS, INC., | |
| Defendants. | |

## I. INTRODUCTION

This action arises out of a series of disputes over the dissolution of a pension plan administration business. Plaintiff Leigh Ann Jackson ("Jackson" or "Plaintiff") and Defendant Eileen Gaspar ("Gaspar" or "Defendant") each owned half of a now-defunct business, Professional Pension Administrators, Inc., which the Court will refer to as "PPA I" for ease of understanding. After a number of disagreements between the owners, the business was dissolved and each started their own pension administration company. This case is the third suit between the parties, with the other two in state court, and is a shareholder derivative action brought by Jackson on behalf of PPA I. Plaintiff brought claims of unfair competition, trademark infringement, cybersquatting, and breach of fiduciary duties to both PPA I and Jackson individually. The Court granted summary judgment for Plaintiff on all claims on June 14, 2021 (Dkt. 113).

A bench trial on remedies was held on September 28-29 and October 5, 2021. The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

## II. FINDINGS OF FACT

### A. History of PPA I

1. The first Professional Plan Administrators, Inc. ("Original PPA") was formed on June 9, 1982. Amended Pre-Trial Order, Stipulated Fact No. 1 (Dkt. 163-1).
2. Jackson and Gaspar formed a California corporation, Professional Pension Administrators, Inc. ("PPA I"), on June 16, 2006. *Id.* Stipulated Fact No. 2. Jackson and Gaspar were each 50% shareholders and directors of PPA I. *Id.* Stipulated Fact No. 3.
3. On August 15, 2006, PPA I purchased the Original PPA's assets for a total of

$194,200. Ex. 8. The assets purchased included the customer lists and files, the trade name ("Professional Plan Administrators"), the trademark ("PPA"), the domain name PPAdmin.com, and the goodwill associated with the business. *Id.*

4. PPA I conducted business using the trade name "Professional Plan Administrators" and also referred to itself as "PPA." Trial Testimony of Eileen Gaspar. Gaspar filed fictitious business name statements with the Orange County Recorder's Office reflecting that PPA I was doing business as "Professional Plan Administrators." Ex. 5; Ex. 6; Ex. 7.

5. PPA I developed a design mark in December 2006. Amended Pre-Trial Order, Stipulated Fact No. 5.

6. Gaspar generally had a more client-facing role and was very active with building client relationships. Trial Testimony of Leigh Ann Jackson.

7. Jackson and Gaspar split responsibility for PPA I's clients, and subsequently split them with Gaspar's daughter, Ashley Athaide ("Athaide"), when she joined the company. Ex. 169. In 2017, Jackson was the lead plan administrator for 95 clients, while Gaspar and Athaide together were lead administrators for 162 clients. *Id.*

### B. Initial disputes between the parties

8. Jackson and a referral source to PPA, Christopher Sutcliff, testified about an incident at a PPA I holiday party in 2009 at which Jackson fell while intoxicated. Trial Testimony of Leigh Ann Jackson; Trial Testimony of Christopher Sutcliff.

9. In 2017, a series of disputes arose between Jackson and Gaspar. Amended Pre-Trial Order, Stipulated Fact No. 6. Jackson and Gaspar had initially intended to sell the business and split the profits. However, after Gaspar's daughter Athaide joined the business, Gaspar's plans changed and she considered selling the business to Athaide. Trial Testimony of Leigh Ann Jackson.

10. After Jackson rejected Gaspar's proposal to sell to Athaide, the parties engaged in discussions in June 2017 about a potential buyout of Jackson's interest in PPA I. *Id.*

11. After discussions soured, Jackson filed a lawsuit against Gaspar in Orange County Superior Court. *See Jackson v. Gaspar et al.*, No. 30-2017-946974-CU-MC-CJC.

12. Gaspar subsequently installed cameras in PPA I's offices in an attempt to halt Jackson's sometimes aggressive conduct toward staff. Trial Testimony of Eileen Gaspar.

13. The parties again entered discussions about selling Jackson's interest to Gaspar. Jackson testified that she would have accepted approximately $400,000 for her half-interest, but that the sale did not go through as the parties could not agree on terms. Trial Testimony of Leigh Ann Jackson.

### C. Creation of new companies

14. On June 27, 2017, Jackson filed articles of incorporation for a new company, Empire Administration, Inc. *Id.*

15. On August 15, 2018, Gaspar registered the domain name PPA401K.com. Amended Pre-Trial Order, Stipulated Fact No. 7. The website was launched on April 1, 2019. Trial Testimony of Eileen Gaspar.

16. On August 27, 2018, Gaspar formed Professional Plan Administrators, Inc. (PPA II) after she found the name available on the California Secretary of State website. Amended Pre-Trial Order, Stipulated Fact No. 8.

17. On September 20, 2018, Gaspar established a bank account in PPA II's name at Wells Fargo. Trial Testimony of Eileen Gaspar.

18. On October 19, 2018, Gaspar filed a fictitious business name statement that PPA II intended to do business using PPA I's name. Ex. 134.

19. In April 2019, PPA II designed and began using the infringing logo. Trial Testimony of Eileen Gaspar.

20. Gaspar presented an expert on appraising privately-held companies and their intangible assets, who testified that PPA I's intellectual property was worth approximately $25,000 using the 'relief from royalty' method of calculating potential

licensing revenue. Trial Testimony of Christopher Kramer. The expert further testified that intellectual property is a relatively small asset for business-to-business services companies as opposed to consumer-facing companies. *Id.*

21. The parties stipulated that PPA II's profits between April 1, 2019 and December 31, 2019 were $92,500; for calendar year 2020 were $240,000; and between January 1, 2021 and July 15, 2021 were $235,000.

22. PPA II received a Paycheck Protection Program ("PPP") loan in the amount of $80,148 for certain 2020 payroll expenses. The PPP loan was forgiven in its entirety in 2021. Ex. 308.

### D. PPI I dissolution

23. On August 22, 2018, Jackson filed a second suit in Orange County Superior Court for appointment of a provisional director to resolve deadlocks between the parties. *See Jackson v. Professional Pension Administrators, Inc.*, No. 30-2018-1014283-CU-PT-CJC.

24. On September 28, 2018, Gaspar removed the majority of PPA I's furniture, equipment, servers, and client files out of the office. Trial Testimony of Leigh Ann Jackson; Trial Testimony of Eileen Gaspar.

25. Gaspar also terminated Jackson's access to the ASC DGEM plan administration software, QuickBooks, and payroll, and ended Jackson's business cell phone account. Trial Testimony of Leigh Ann Jackson; Trial Testimony of Eileen Gaspar.

26. After learning about the move, Jackson wrote three checks to herself from PPA I's business bank account. Ex. 104. The checks were for $9000, $9900, and $9999 respectively, almost the full amount in PPA I's bank account. *Id.* Jackson's attempts to deposit the checks into her personal bank account were unsuccessful. *Id.* She subsequently attempted to shred the checks. Trial Testimony of Leigh Ann Jackson.

27. On October 1, 2018, Gaspar filed a Certificate of Election to Wind Up and Dissolve PPA I with the California Secretary of State. Amended Pre-Trial Order, Stipulated

the PPA I Board to inquire about the company's functions. Ex. 188. On October 18, 2018, Jackson noted her complaints and requested access in a letter to Gaspar; Gaspar responded the next day but did not address the issues raised. Ex. 190; Ex. 310. On November 5, 2018, Jackson sought a special meeting of the PPA I Board to ask about how clients were being serviced, but Gaspar did not attend. Ex. 191; Trial Testimony of Leigh Ann Jackson.

34. A few weeks after moving out, Gaspar moved PPA I's furniture back into the same office and resumed operations there as PPA II. Trial Testimony of Eileen Gaspar.

35. Judge Jonathan H. Cannon was appointed as provisional director for PPA I on January 8, 2019. On February 18, 2019, the Board of Directors of PPA I met and adopted several resolutions for dissolving the company. Ex. 25.

36. Gaspar terminated PPA I's lease on September 28, 2018. Trial Testimony of Eileen Gaspar. Gaspar paid rent for October 2018 through January 2019 for the office space formerly occupied by PPA I, which was taken over by PPA II. *Id.* PPA II included the rent for October – December 2018 as business expenses on its taxes. Ex. 316.

37. However, Gaspar represented to the PPA I board that she paid a total of $10,200 in rent on behalf of PPA I for November 2018 – January 2019. Ex. 25; Trial Testimony of Eileen Gaspar. Based on this representation, Judge Cannon and the PPA I board approved a reimbursement payment from PPA I to Gaspar. *Id.*

38. Gaspar concedes that by the end of March 2019, she had erroneously withheld a total of $5,525 of payments to PPA II that were owed to PPA I. Trial Testimony of Eileen Gaspar. Gaspar took affirmative steps to hide these payments including deleting invoices.

39. On May 24, 2019, Gaspar filed a Certificate of Dissolution for PPA I with the California Secretary of State. Amended Pre-Trial Order, Stipulated Fact No. 10.

E. Client choices

40. One of the resolutions adopted at the February PPA I Board meeting stated:

"Resolved, a notice letter shall be emailed to all customers of the Corporation informing them of the pending change. The letter shall contain contact information for each shareholder. The letter shall be emailed during the period March 18 through March 25, 2019 with 'cc' copies to both Gaspar and Jackson and shall be in the form submitted herewith. The shareholders shall be free to service the customers upon emailing the notice. Each shareholder shall forward to the other shareholder all customer email responses." Ex. 25.

41. The text of the letter approved in the February meeting did not have contact information for Jackson or Gaspar, and as such did not disclose Gaspar's intent to use PPA I's trade name for her new company. *Id.*

42. Gaspar later filled out both parties' contact information on the customer letter. Trial Testimony of Eileen Gaspar.

43. Ultimately, approximately 90% of PPA I's customers selected Gaspar and approximately 10% selected Jackson. Ex. 36.

44. Several clients provided their rationales for choosing Jackson or Gaspar in their selection letters. Many noted wanting to stay with a specific contact person: "[We] desire to have Eileen Gaspar continue to manage our account;" "We are going to stay with Eileen and Victoria;" "Hi Ashley, I want to stay where you are because you are awesome!"; and "Eileen has been my contact person and I'd like to stay with her." Ex. 36.

45. In addition, Jackson followed up with several clients who chose Gaspar to ask about their rationales. Donna Little wrote that Gaspar was the last person she'd spoken to. Ex. 37. A different client and his family were unable to reach Jackson between October 2018 and April 2019. Ex. 38. Another client had chosen Gaspar after Gaspar called him to solicit his business; he noted that the accountant he dealt with was staying with Gaspar and that he had not heard anything from Jackson. Ex. 39. Elements Architecture elected Gaspar "to keep continuity of the same office and

|   |     |   |
|---|-----|---|
| 1 |     | closer location" than where Jackson's new company was located in Chino. Ex. 40. |
| 2 |     | Another client said they did not receive any response from Jackson after emailing |
| 3 |     | and leaving a voicemail. Ex. 41. |
| 4 | 46. | Only one customer said he was confused by the letter; that customer remained with |
| 5 |     | Jackson after the split. Trial Testimony of Leigh Ann Jackson. |
| 6 | 47. | Christopher Sutcliff, a referral source, testified that he began to refer clients solely to |
| 7 |     | Gaspar due to Jackson's failure to return calls or reply to emails during the three-to- |
| 8 |     | six months prior to the election letter being sent. Trial Testimony of Christopher |
| 9 |     | Sutcliff. Sutcliff also testified that when he reached out to Jackson, it became evident |
| 10 |    | that she had no solid plans for servicing clients in her new business. *Id.* |
| 11 | 48. | After the split, several customers who had chosen to go with Jackson switched to |
| 12 |    | Gaspar; one wrote to Gaspar that it "may have been a mistake" to go with Jackson as |
| 13 |    | "[s]he will not respond to my emails nor return my phone calls." Ex. 45. |

## III. CONCLUSIONS OF LAW

**A. Trademark infringement under the Lanham Act**

49. To establish a claim under Section 1125(a) of the Lanham Act, a plaintiff must show (1) it has a protectable ownership interest in the mark; and (2) the defendant's use of the mark is likely to cause customer confusion. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012). Section 1125(a) also protects against infringement of unregistered marks. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 926 (9th Cir. 2014). The same elements are required to establish a claim for common law trademark and trade name infringement under California law. *Rearden*, 683 F.3d at 1221. The Court previously granted summary judgment for Plaintiff on her Lanham Act claim.

50. A corporate officer or director is generally personally liable for all torts which she authorizes or directs or in which she participates, notwithstanding that she acted as an

agent of the corporation, including for acts of trademark infringement. *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823-24 (9th Cir. 1996). As an officer and director of PPA II, Gaspar is liable for PPA II's acts of infringement.

51. Jackson brought her trademark infringement claim in a derivative capacity on behalf of PPA I. As such, PPA I is entitled to any recovery from the trademark claim, not Jackson individually. As the sole shareholders of PPA I, Jackson and Gaspar would ordinarily equally split any recovery to PPA I.

   1. **Damages**

52. "Recovery of damages for trademark infringement is subject to the usual standards of damages: plaintiff must prove both causation and amount." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:72 (5th ed.).

53. Gaspar and PPA II's use of PPA I's intellectual property took control of that intellectual property away from PPA I. However, for the majority of the time period of the infringing use, PPA I was not operational, and so it did not lose any business due to the infringing use.

54. The Court accepts Mr. Kramer's determination of a royalty rate of 1.5% of PPA II's annual revenue, leading to a valuation of $25,000 for the intellectual property. This determination is reasonable as PPA I purchased the entire Original PPA, including its intellectual property, for $194,200, and trademarks have less value in a service business catering to other companies than in a consumer business. PPA I is accordingly awarded a royalty of $25,000 as actual damages.

55. The Ninth Circuit has instructed that "the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party." *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982).

56. Here, there was no evidence presented to show that PPA II made any profit due to its infringing use of PPA I's marks. No customer was called to testify as to their

confusion, and the only customer who had previously noted confusion did not choose to go with PPA II. Instead, the responses from customers who chose PPA II centered on existing relationships with Gaspar; the proximity of PPA II's offices compared to Jackson's offices in Chino; and Jackson's consistent non-responsiveness. As such, Jackson did not establish with reasonable certainty that PPA II's profits were attributable to the infringing conduct or inequitably obtained, so the Court does not award any of PPA II's profits to PPA I.

### 2. Injunctive relief

57. Under 15 U.S.C. § 1116(a), this Court has the power to grant "injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation" of PPA I's rights as owner of its trademarks. "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).

58. While "cessation of the unlawful conduct can moot" a trademark dispute, "the reform of the defendant must be irrefutably demonstrated and total." *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986). In *Polo Fashions*, the Ninth Circuit noted that defendants had willfully violated plaintiff's trademark rights and had "refused to stop violating those rights until [plaintiff] brought suit in federal district court." *Id.* The court held that an injunction was appropriate since it gave plaintiff protection for its mark without harming defendant if they sincerely intended no future infringement. *Id.*

59. The situation here is in many ways analogous to that in *Polo Fashions*. PPA II did not notify PPA I that it had established a new company with the same trade name. It continued to use PPA I's intellectual property for several years, until a month after the Court granted summary judgment for Plaintiff. And Gaspar testified that she still

owns the infringing domain name.

60. Accordingly, the Court orders permanent injunctive relief.

### A. Unfair competition

61. To prevail on a false advertising claim under Section 43 of the Lanham Act, or a corresponding unfair competition claim under California Business and Professions Code § 17200, a plaintiff must show (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014). Actions under § 17200 are "substantially congruent" to those under the Lanham Act. *Clearly v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994).

62. PPA II posted statements on its website that were likely to deceive consumers by using PPA I's trademark, trade name, and similar logo. The website also included statements implying that it was the same company as PPA I, such as stating that it had been in business since "the company's inception in 1982."

63. While Jackson offered evidence for how the statements on the website injured her as an individual running her new company, this is a derivative suit, so the Court considers only injury to PPA I.

64. However, as discussed above, there is no evidence that PPA I was injured by this use besides losing control of its intellectual property, as PPA I was defunct and had no business to lose. The loss of control has been adequately compensated by the damage award for the royalty value of PPA I's intellectual property.

### B. Anti-cybersquatting Consumer Protection Act

65. To prevail on a claim for cyberpiracy under the Anti-cybersquatting Consumer

1 Protection Act ("ACPA"), 15 U.S.C. 1125(d), Plaintiff must prove that the defendant (1) registered, trafficked in, or used a domain name, (2) that is confusingly similar to the plaintiff's trademark, and (3) had a bad faith intent to profit from that domain name. *See* 15 U.S.C. § 1125(d)(1)(A).

66. There is no dispute here that Gaspar registered the domain name PPA401K.com on August 15, 2018, satisfying the first element.

67. In determining whether there is a likelihood of confusion under the second element, courts compare the mark with the name of the website. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004). "A court should not look beyond the domain name to consider the content of the website." *eAdGear, Inc. v. Liu*, No. 11-cv-5398-JAS, 2012 WL 2367805, at *13 (N.D. Cal. June 21, 2012) (citing *Purdy*, 382 F.3d at 783). Nor will courts consider the top-level domains (e.g., ".com" or ".net"). *See Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004). As the Court noted in its summary judgment order, "[c]omparing the Trademark (PPA) with the Accused Domain Name, the two terms are confusingly similar due to the shared use of 'PPA.' Order at 11.

68. To evaluate bad faith intent under the third element, courts may consider the nine non-exhaustive factors in 15 U.S.C. § 1125(d)(1)(B). Those factors include whether the registrant had "intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark" and "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services." But "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

69. Here, the name was arbitrary and distinctive, and the domain name is confusingly similar to PPA I's mark because it uses the same acronym and does not make clear

13

that it is not affiliated with PPA I. As such, Defendant did not have reasonable grounds to believe using the same acronym in the domain name was a fair use, and Plaintiff succeeds on the third element of the ACPA claim.

70. When a violation is found under 15 U.S.C. § 1125(d), "the plaintiff may elect . . . to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). Plaintiff elected statutory damages for Defendants' violation of 15 U.S.C. § 1125(d)(1).

71. Courts may evaluate a number of factors in determining a just damage award, "including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter—i.e., one who has engaged in a pattern of registering and using a multitude of domain names that infringe the rights of other parties—and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings." *Verizon Cal. Inc. v. Onlinenic, Inc.*, No. 08-cv-2832-JF, 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009).

72. Here, Gaspar registered one website, did not conceal her registration or contact information, and is not a serial violator. But the website did contain representations intended to confuse viewers into thinking it was the same as PPA I.

73. In addition, Defendants' resistance during discovery resulted in the magistrate judge issuing four orders to compel, including one noting that Gaspar's "preparation, recollection and candor appear to have been marginal at best." Order to Compel (Dkt. 98) at 2. However, the magistrate judge concluded that "[f]ault also lay with both sides."

74. Accordingly, the circumstances in this case merit an award on the low end of the statutory damage range, and the Court awards $5,000 to PPA I for cybersquatting.

**C. Breach of fiduciary duty to PPA I**

75. To succeed on a breach of fiduciary duty claim in California, a plaintiff must establish the existence of a fiduciary relationship, breach of that duty, and damages. *Charnay v. Cobert*, 145 Cal. App. 4th 170, 182 (2006).

76. In its summary judgment order, the Court found that Gaspar breached her duty to PPA I as its director and officer by infringing on PPA I's intellectual property and using its goodwill to benefit her new company. Order at 12-13. However, as discussed above, the only harm to PPA I was loss of control of its intellectual property and accompanying goodwill, which has already been compensated with the $25,000 royalty award. *See Rogers v. Davis,* 28 Cal. App. 4th 1215, 1220 (1994) (plaintiff may request alternative remedies "but may not be awarded both to the extent such an award would constitute a double recovery").

77. Gaspar also affirmatively covered up her taking $5,525 from PPA I, and does not dispute her obligation to repay that sum.

78. Finally, Gaspar also breached her duty to PPA I by seeking and receiving reimbursement from PPA I for $10,200 in rent, even though PPA I had no lease obligation, and then claiming it as a deductible business expense for PPA II on its 2018 federal tax return. Such double-counting was improper and PPA II must repay the three months of rent to PPA I. Therefore, the Court awards a total of $15,725 to PPA I for breach of fiduciary duty.

**D. Breach of fiduciary duty to Jackson**

79. The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Central Laborers' Pension Fund v. McAfee, Inc.*, 17 Cal. App. 5th 292, 317 (2017).

80. At trial, Jackson presented evidence in support of her claim of breach of fiduciary duty regarding Defendants' conduct toward her between September 28, 2018 and

March 18, 2019 (the "freeze out"). This evidence was not raised in Jackson's summary judgment briefing, *see* Plaintiff's MSJ (Dkt. 92), but the Court determined liability on the individual breach of fiduciary duty claim.

81. However, Jackson raised these facts even before the case was filed, sending several communications to Gaspar and the PPA I Board about her freeze-out concerns. In addition, these facts were brought up throughout the bench trial; Gaspar had the opportunity to cross-examine all witnesses on these facts and elicited testimony challenging several elements of the freeze-out allegations. As such, there is no prejudice to Defendants by considering these facts now.

82. Moreover, if parties were not allowed to bring out additional facts at a damages trial to persuade the Court of the magnitude of the violation or level of culpability, it is difficult to see the point of having a damages trial at all.

83. Gaspar's actions caused Jackson to lose access to updated customer files and business records as of October 1, 2018. Gaspar also terminated Jackson's access to the ACS DGEM cloud software as of September 28, 2018, which Jackson needed to service customers. Jackson was also cut off from QuickBooks and payroll, which she needed as CFO of PPA I. Gaspar terminated Jackson's business phone number, which clients used to contact Jackson. Gaspar's intentional or negligent actions also led to Jackson losing voicemail after the switch to Jive on October 4, 2018. Gaspar was aware of these effects due to Jackson's complaints and requests for access.

84. The result of these actions substantially hindered Jackson's ability to carry out her job and service clients, while increasing Gaspar's ability to do so. The harm to Jackson is distinct from the harm to PPA, as TPA services are relationship-based and Gaspar gained an untoward advantage over Jackson.

85. Jackson's annual income prior to the split was $150,000. Trial Testimony of Leigh Ann Jackson. The evidence at trial showed that Jackson lost approximately 80% of her customers between mid-2018 and mid-2019. *Id.*; Ex. 45; Ex. 65. This resulted in

significant financial loss, which the Court estimates at $120,000, 80% of her prior annual income. However, the Court does not award damages from more than one year of income, because after that point any harm became attenuated as Jackson had the capacity and time to reconstitute her business.

86. However, the loss of customers was caused not just by Gaspar's intentional freeze-out actions, but also by Jackson's lack of responsiveness over email and choosing to move her business to Chino, farther away from her clients in Orange. Since the Court finds that Gaspar's and Jackson's actions both contributed to this loss of customers, the Court awards Jackson 50% of the loss, which totals $60,000 in damages in her individual capacity on the breach of fiduciary duty claim.

## IV. CONCLUSION

For the reasons explained above, the Court AWARDS $45,725 to PPA I and $60,000 to Ms. Jackson individually. Based on Ms. Jackson's individual interest in PPA I, she is entitled to receive 50% of PPA I's award, for a total award to her of $82,862.50. The Court ENJOINS Ms. Gaspar, PPA II, and their agents and employees from using any intellectual property owned by PPA I in any capacity. Plaintiff shall submit a proposed judgment **on or before November 30, 2021.**

DATED: November 17, 2021

*David O. Carter*
———————————————
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE